2015-1880

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

PAR PHARMACEUTICAL, INC.,
ALKERMES PHARMA IRELAND LIMITED,

*Plaintiffs-Appellants*,

v.

TWI PHARMACEUTICALS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the District of
Maryland in Case No. 1:11-cv-02466-CCB, Judge Catherine C. Blake

## OPENING BRIEF FOR APPELLANTS

| | |
|---|---|
| Maryellen Noreika | Daniel G. Brown |
| Jack B. Blumenfeld | LATHAM & WATKINS LLP |
| Jeremy A. Tigan | 885 Third Avenue |
| MORRIS, NICHOLS, ARSHT & | New York, NY 10022-4834 |
|    TUNNELL LLP | (212) 906-1200 |
| 1201 North Market Street | |
| P.O. Box 1347 | Gregory G. Garre |
| Wilmington, DE 19899 | Jonathan Y. Ellis |
| (302) 658-9200 | Michael J. Gerardi |
| | LATHAM & WATKINS LLP |
| *Counsel for Plaintiff-Appellant* | 555 Eleventh Street, NW |
| *Alkermes Pharma Ireland Limited* | Suite 1000 |
| | Washington, DC 20004 |
| | (202) 637-2207 |
| | |
| | *Counsel for Plaintiff-Appellant Par* |
| | *Pharmaceutical, Inc.* |

August 24, 2015

*Additional Counsel Listed on Inside Cover*

James Patrick Ulwick
KRAMON AND GRAHAM, P.A.
One South Street
Suite 2600
Baltimore, MD 21202
(410) 752-6030

*Counsel for Plaintiff-Appellant*
*Alkermes Pharma Ireland Limited*

Roger J. Chin
Gregory K. Sobolski
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600

James Patrick Ulwick
KRAMON AND GRAHAM, P.A.
One South Street
Suite 2600
Baltimore, MD 21202
(410) 752-6030

*Counsel for Plaintiff-Appellant Par*
*Pharmaceutical, Inc.*

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Par Pharmaceutical, Inc. certifies the following:

1. The full name of every party or amicus curiae represented by me is:

   Par Pharmaceutical, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Par Pharmaceutical, Inc., a nongovernmental corporate entity, is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc.  Par Pharmaceutical Companies, Inc. is a wholly-owned subsidiary of Sky Growth Holdings Corporation, which has no parent corporation, and no publicly held company owns 10% or more of the stock of Sky Growth Holdings Corporation.

4. The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court are:

   **Latham & Watkins LLP** (asterick indicates no longer with indicated firm): Daniel G. Brown, Gregory G. Garre, Roger J. Chin, Katherine I. Twomey*, Gina R. Gencarelli*, Terrence J.P. Kearney, Jennifer Koh, Jennifer R. Saionz*, Sami Sedghani, Michael R. Seringhaus, Jennifer M. Halbleib, Jonathan Y. Ellis, Gregory K. Sobolski, Michael J. Gerardi

   **Wilson Sonsini Goodrich & Rosati, P.C.** (asterisk indicates no longer with indicated firm): Daniel G. Brown*, Gina R. Gencarelli*, Mitchell Epner*, Jennifer R. Saionz*

   **Kramon and Graham PA:** James P. Ulwick

Dated: August 24, 2015                    Respectfully submitted,


                                          /s/ Daniel G. Brown
                                          Daniel G. Brown
                                          LATHAM & WATKINS LLP
                                          885 Third Avenue
                                          New York, NY 20022-4834
                                          (212) 906-1200

                                          *Counsel for Par Pharmaceutical, Inc.*

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Alkermes Pharma Ireland Limited certifies the following:

1.     The full name of the party represented by us is:  Alkermes Pharma Ireland Limited.

2.     The name of the real party in interest represented by us is:  not applicable.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:  Alkermes Pharma Ireland Limited is a subsidiary of Alkermes plc, a publicly held corporation.  FMR LLC; Wellington Management Group, LLP; and T. Rowe Price Associates, Inc. all own 10 percent or more of Alkermes plc's stock.

4.     The names of all law firms and the partners or associates that appeared for the party represented by us in the trial court or are expected to appear in this Court are:

> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> Jack B. Blumenfeld
> Maryellen Noreika
> Jeremy A. Tigan
>
> KRAMON & GRAHAM, P.A.
> James P. Ulwick

Dated: August 24, 2015                    Respectfully submitted,


                                          /s/ Maryellen Noreika
                                          Maryellen Noreika
                                          MORRIS, NICHOLS, ARSHT &
                                              TUNNELL LLP
                                          1201 North Market Street
                                          P.O. Box 1347
                                          Wilmington, DE 19899
                                          (302) 658-9200

                                          *Counsel for Plaintiff-Appellant*
                                          *Alkermes Pharma Ireland Limited*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ..........................................................i

TABLE OF AUTHORITIES .......................................................... vii

STATEMENT OF RELATED CASES ...............................................1

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF THE ISSUES.......................................................2

INTRODUCTION ..........................................................................2

STATEMENT OF THE CASE...........................................................7

I.      FACTUAL BACKGROUND........................................................7

II.     PROCEDURAL HISTORY .......................................................11

        A.      Bench Trial ..............................................................11

        B.      Par's First Appeal......................................................13

        C.      Proceedings on Remand ............................................14

SUMMARY OF ARGUMENT .........................................................15

STANDARD OF REVIEW ............................................................19

ARGUMENT ..............................................................................20

I.      THE DISTRICT COURT ERRED AGAIN BY FINDING THE
        PATENT INVALID FOR OBVIOUSNESS.................................20

        A.      TWi Did Not Prove by Clear and Convincing Evidence that the
                Food Effect Limitations Are Inherent in the Prior Art.......................21

        B.      The District Court Committed Multiple Legal Errors in Its
                Remand Opinion...........................................................28

**Page**

1.  The district court violated this Court's mandate by revisiting the motivation to combine and refusing to consider dependent claims ........................................................ 28

2.  The district court again applied the wrong legal standard for inherency in the context of obviousness ............................. 32

3.  The district court improperly tasked Par with disproving inherency and disregarded its counter-examples ...................... 35

II.  THE DISTRICT COURT ERRED BY FINDING THE ASSERTED CLAIMS NOT ENABLED .......................................................... 38

A.  The District Court Relied on Conclusory Expert Testimony Lacking Any Indication About Quantity of Experimentation ............ 38

B.  The Court Erred By Discounting Par's Expert Testimony Regarding the Specification's Working Examples and Routine Experimentation .................................................................. 45

C.  The District Court's Analysis Was Premised on an Incorrect Legal Test ......................................................................... 47

CONCLUSION .................................................................................. 55

# TABLE OF AUTHORITIES

Page(s)

## CASES

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ..........................................................20

*Alcon Research, Ltd. v. Apotex Inc.*,
  687 F.3d 1362 (Fed. Cir. 2012) ...........................................21, 50, 51

*Allergan, Inc. v. Barr Laboratories, Inc.*,
  501 F. App'x 965 (Fed. Cir. 2013) ....................................................35

*Allergan, Inc. v. Sandoz, Inc.*,
  726 F.3d 1286 (Fed. Cir. 2013), *cert. denied*, 134 S. Ct. 1764
  (2014) ....................................................................................16, 22, 23

*Allergan, Inc. v. Sandoz Inc.*,
  No. 2014-1275, 2015 WL 4639308 (Fed. Cir. Aug. 4, 2015) ......................38, 53

*Amgen, Inc. v. Chugai Pharmaceutical Co.*,
  927 F.2d 1200 (Fed. Cir. 1991) ..........................................................43

*Aspex Eyewear, Inc. v. Concepts in Optics*,
  111 F. App'x 582 (Fed. Cir. 2004) ....................................................35

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
  750 F.2d 1569 (Fed. Cir. 1984) ...........................................40, 53, 54

*Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*,
  707 F.3d 1330 (Fed. Cir. 2013) ...............................................*passim*

*In re Cuozzo Speed Technologies, LLC*,
  778 F.3d 1271 (Fed. Cir. 2015) ..........................................................34

*Dey, L.P. v. Teva Parenteral Medicines, Inc.*,
  6 F. Supp. 3d 651 (N.D. W. Va. 2014) ..............................................26

*In re Dinh-Nguyen*,
  492 F.2d 856 (CCPA 1974) ................................................................54

vii

**Page(s)**

*Elan Pharmaceuticals, Inc. v. Mayo Foundation for Medical*
  *Education & Research*,
  346 F.3d 1051 (Fed. Cir. 2003) ..........................................................43

*Engel Industries, Inc. v. Lockformer Co.*,
  166 F.3d 1379 (Fed. Cir. 1999) .........................................................29

*Eurand, Inc. v. Mylan Pharmaceuticals, Inc. (In re Cyclobenzaprine*
  *Hydrochloride Extended Release Capsule Patent Litigation)*,
  676 F.3d 1063 (Fed. Cir. 2012) ...................................................17, 36

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
  802 F.2d 1367 (Fed. Cir. 1986) .........................................................20

*Kloster Speedsteel AB v. Crucible Inc.*,
  793 F.2d 1565 (Fed. Cir. 1986) .........................................................23

*Koito Manufacturing Co. v. Turn-Key-Tech, LLC*,
  381 F.3d 1142 (Fed. Cir. 2004) .........................................................36

*In re Kubin*,
  561 F.3d 1351 (Fed. Cir. 2009) .........................................................21

*Laitram Corp. v. NEC Corp.*,
  115 F.3d 947 (Fed. Cir. 1997) ...........................................................19

*In re Lee*,
  277 F.3d 1338 (Fed. Cir. 2002) .........................................................17

*MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*,
  687 F.3d 1377 (Fed. Cir. 2012) .........................................................52

*Moba, B.V. v. Diamond Automation, Inc.*,
  325 F.3d 1306 (Fed. Cir. 2003) .....................................................6, 39

*In re Oelrich*,
  666 F.2d 578 (C.C.P.A. 1981) .............................16, 21, 22, 33, 35

*Par Pharmaceutical, Inc. v. TWI Pharmaceuticals, Inc.*,
  773 F.3d 1186 (Fed. Cir. 2014) ...............................................*passim*

**Page(s)**

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ...........................................................20

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
536 F.3d 1256 (Fed. Cir. 2008) ..........................................................36

*In re Rijckaert*,
9 F.3d 1531 (Fed. Cir. 1993) ........................................................21, 23

*In re Robertson*,
169 F.3d 743 (Fed. Cir. 1999) ............................................................21

*Schumer v. Laboratory Computer Systems, Inc.*,
308 F.3d 1304 (Fed. Cir. 2002) ..........................................................36

*Talbert Fuel Systems Patents Co. v. Unocal Corp.*,
275 F.3d 1371 (Fed. Cir.), *vacated on other grounds*, 537 U.S. 802
(2002) .................................................................................................21

*United States v. Telectronics, Inc.*,
857 F.2d 778 (Fed. Cir. 1988) ..................................................6, 38, 45

*W.L. Gore & Associates v. Garlock, Inc.*,
721 F.2d 1540 (Fed. Cir. 1983) ..........................................................17

*In re Wands*,
858 F.2d 731 (Fed. Cir. 1988) ............................................................38

*Whitserve, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012) ........................................................17, 36

**STATUTES**

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ...........................................................11

28 U.S.C. § 1295(a)(1) ...............................................................................1

28 U.S.C. § 1331 .........................................................................................1

28 U.S.C. § 1338(a) ....................................................................................1

35 U.S.C. § 103 ......................................................................................2, 20

**Page(s)**

35 U.S.C. § 112 (2006) ......................................................................31, 48

35 U.S.C. § 282 ....................................................................................20

## OTHER AUTHORITIES

Federal Rule of Appellate Procedure 28(a)(4)............................................1

Federal Rule of Appellate Procedure 28(a)(5)............................................1

## STATEMENT OF RELATED CASES

The following cases are pending in district court and could potentially be affected by this appeal:

- *Par Pharm., Inc., et al. v. Breckenridge Pharm., Inc.*, No. 1:13-cv-01114-SLR (D. Del.)

- *Par Pharm., Inc., et al. v. Breckenridge, Inc., et al.*, No. 1:15-cv-00486-SLR (D. Del.)

- *Par Pharm., Inc., et al. v. TWi Pharm., Inc., et al.*, No. 1:15-cv-00698-SLR (D. Del.)

- *Par Pharm., Inc. et al. v. TWi Pharm., Inc., et al.*, No. 1:15-cv-00710-SLR (D. Del.)

## JURISDICTIONAL STATEMENT

Under Federal Rule of Appellate Procedure 28(a)(4) and Federal Circuit Rule 28(a)(5), counsel for Par Pharmaceutical, Inc. and Alkermes Pharma Ireland Limited (collectively, "Par") state:

(a) The U.S. District Court for the District of Maryland had subject matter jurisdiction over this patent-infringement suit under 28 U.S.C. §§ 1331 and 1338(a).

(b) The district court entered a final judgment on July 28, 2015. This Court has exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1).

(c) Par timely filed a notice of appeal on July 28, 2015. A27872-73.

## STATEMENT OF THE ISSUES

I.   Whether the district court erred in again holding that TWi proved by clear and convincing evidence that the asserted claims of U.S. Patent No. 7,101,576 ("'576 patent"), A60-94, are invalid as obvious.

II.   Whether the district court erred in holding that TWi proved by clear and convincing evidence that the asserted claims of the '576 patent are invalid as not enabled.

## INTRODUCTION

This case returns to this Court after it reversed the district court's judgment of invalidity of the asserted claims of the '576 patent under 35 U.S.C. § 103 "for further analysis of the food effect limitation," as well as "other grounds for invalidity, such as enablement, if necessary."  *Par Pharm., Inc. v. TWi Pharm., Inc.* (hereinafter "*Par I*"), 773 F.3d 1186, 1200-01 (Fed. Cir. 2014).  After remand, the district court repeated the errors it previously made by finding the patent invalid as obvious, and wrongly concluded that the asserted claims were not enabled.

By the 2002 priority date for the '576 patent, megestrol acetate ("megestrol") had been used to treat severe weight loss in anorexic HIV/AIDS patients for almost a decade in an oral suspension dosage form ("Megace OS"). Despite this long use, the inventors of the '576 patent discovered that fasting patients—the very target patient population—barely absorbed the drug into their

bloodstream, whereas patients who took the drug after eating had 600-700% higher absorption of the drug into their system. To address this serious and previously unknown problem, known as the "food effect," the inventors ultimately developed an alternative megestrol product using nanoparticulate technology, which had previously been used in only one marketed drug product. The new product greatly increased fasted-state absorption and substantially eliminated the observed food effect. *See* A6077-86; A3215 (38:6-39:4).

The district court held a bench trial on validity in October 2013. At trial, TWi and its expert, Dr. David Beach, advanced the theory that the asserted claims would have been obvious because the bioavailability problem, and related food effect for megestrol, would have been known or predictable from the prior art. In its first decision, the district court rejected TWi's position and agreed with Par that "there was no known food effect for megestrol in the prior art" at the time of the invention that would have led a skilled artisan to create a megestrol formulation addressing the issue of drug absorption in fasting patients. *Par I*, 773 F.3d at 1194. The court nevertheless concluded that the asserted claims were obvious based on its finding that different problems in the prior art (high viscosity and interpatient variability) would have given a skilled artisan alternative motivations to combine nanotechnology with megestrol acetate. Acknowledging that those problems would not motivate a skilled artisan to achieve a nanoparticulate megestrol acetate

3

with the particular claim limitations related to solving the food-effect problem, the district court disregarded those limitations by summarily concluding that "[t]he claimed pharmacokinetic properties with respect to a food effect . . . are *inherent properties* of the obvious nanoparticulate formulation." *Id.* (emphasis added) (citation omitted).

This Court reversed. It concluded "that the district court erred in its inherency analysis under our precedent." *Id.* This Court noted the "high standard" that must be applied when using the inherency doctrine in the context of obviousness, specifically stating that "the use of inherency . . . must be carefully circumscribed in the context of obviousness." *Id.* at 1195-96. Accordingly, on remand, this Court instructed the district court to determine whether "the food effect *as claimed* is *necessarily present* in the prior art combination." *Id.* at 1196 (emphasis in original).

On remand, the district court again applied the incorrect standard. No witness at trial testified that the claimed food-effect parameters would necessarily result from combining the prior art. This Court previously considered the strongest testimony from Dr. Beach regarding inherency and found it insufficient. *Id.* This Court's remand instructions should therefore have resulted in a finding of nonobviousness.

But instead of applying the mandated standard, the district court held that "in the obviousness context examples are enough," A10, and relied upon three sample formulations of megestrol and the previously rejected testimony from Dr. Beach to conclude that the food effect limitations were "inherent in *multiple formulations* of megestrol produced in the 100-400 nm range." A8 (emphasis added). That conclusion is internally inconsistent and cannot be squared with this Court's remand instructions. Further, the district court's decision exceeds the mandate by revisiting the motivation to combine to add a 100 nm - 400 nm particle size range that appears nowhere in the analysis this Court affirmed in *Par I*.

The district court also held, for the first time, that the asserted claims are not enabled. A12. The court concluded that "scientific phenomena" made it "practically impossible" to enable the claimed inventions at particle sizes below 100 nm or above 750 nm. A12-13. In so doing, the court relied on conclusory expert testimony from Dr. Beach that the claims were "really not enabled" outside these arbitrarily selected cut-offs. But he did not testify that outside those ranges it was "practically impossible" for a skilled artisan to practice the asserted claims. Nor did Dr. Beach provide any substantiation of the type and amount of experimentation required. An expert's mere "ipse dixit" "cannot be enough to constitute clear and convincing evidence" of non-enablement. *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1338 (Fed. Cir. 2013).

5

Indeed, Dr. Beach acknowledged the disclosure of actual working embodiments of the claimed formulations. He merely stated that those *examples* did not show that formulations comprising every possible effective average particle size in the claims would achieve the claimed food effect—without any testimony regarding the quantity of experimentation necessary to use the specification's guidance to practice the asserted claims. But proving non-enablement by clear and convincing evidence requires expert testimony that carefully analyzes "the amount of experimentation one of skill in the art would require to [practice the claimed invention] in view of the [patent's] disclosure." *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1321 (Fed. Cir. 2003).

Moreover, though Par's experts *did* testify that a skilled artisan could practice the full scope of the asserted claims using the specification's guidance and routine techniques, the district court discounted that testimony because it supposedly did not show that formulations across the entire claimed effective average particle size range would exhibit the claimed reduction in food effect. That was also legal error, for where "an embodiment is admittedly disclosed in the specification, along with the general manner" of ascertaining a claimed feature, then "other permutations of the invention could be practiced by those skilled in the art without undue experimentation." *United States v. Telectronics, Inc.*, 857 F.2d 778, 786 (Fed. Cir. 1988). At bottom, the court's analysis rested on an incorrect

6

legal test of enablement.

Par respectfully requests that the judgment of the district court be reversed.

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

The FDA approved megestrol acetate tablets to treat cancer in 1971. A3152 (43:12-17). In 1993, Bristol Myers Squibb Company ("BMS") obtained FDA approval to market Megace OS, an oral suspension of the drug. A20-21. This new formulation used micronized megestrol acetate, and was marketed to treat "anorexia, cachexia or [significant] unexplained weight loss" associated with HIV or AIDS. A3152 (43:8-44:17); *see* A5968-80.

Megace OS was a commercial and medical success. A21. Several researchers reported that Megace OS increased body mass in AIDS patients suffering from severe weight loss. A3213 (31:25-32:22). By ameliorating wasting, the OS formulation decreased the associated risks of mortality, morbidity, hospitalization, and opportunistic infection. *Id.* Despite this success, skilled artisans at the time did not appreciate that the drug had a serious absorption problem in fasting patients, which prevented the drug from achieving its full potential in the target patient population.

In 2002—nearly ten years after Megace OS entered the market—the '576 patent inventors began experiments with pharmaceutical formulations that

dramatically reduced the particle size of megestrol acetate to the nanoparticulate range, to see if they could create an improved product.  During their research, they made an entirely surprising and unexpected discovery: When patients took Megace OS (the micronized formulation) without food, they absorbed very little megestrol acetate into their blood streams.  The maximum concentration of the drug in a patient's blood (the "$C_{max}$") was 600-700% lower than for patients who took Megace OS with a high-fat meal.  A7822-25; A84 (Tables 2 & 3, Formulation D); A91 (Tables 12 & 13, Ref. Treatment B); A3164-65 (5:8-10:7); A3168 (23:17-24:17).  In scientific terms, administering Megace OS in the "fasted state" resulted in low bioavailability, but administering it in the "fed state" resulted in much higher bioavailability.

The difference in fed versus fasted bioavailability is called a food effect. This dramatic food effect was a significant latent problem because it prevented the intended patient population—anorexic patients who found it difficult to eat a full meal and often took the drug on an empty stomach—from receiving the full benefit of the drug.

The inventors' discovery of the food effect defied conventional wisdom. A3164-65 (5:3-7, 11:2-8); A3167 (20:19-24); *see also* A3161 (77:23-78:1).  It was contrary to the widespread and consistent administration of Megace OS to patients in the fasted state, A3161 (78:2-79:2), and the practice of experienced clinicians

8

who treated HIV patients for weight loss and wasting, A3211 (21:5-9). *See* A36-37. At the time of the discovery, no one had reported the fasted-state Megace OS bioavailability problem.

Not only did the inventors discover the problem, they also developed a solution. The nanoparticulate formulation they ultimately developed was able to drastically reduce the food effect from a range of 629-787% to a range of 8-55%. *See* A7822-23; A3168-69 (24:19-26:10); A91 (Tables 12 & 13, Treatments A, C, D). The elimination of the food effect represented a significant breakthrough for anorexic and wasting patients. A3213-16 (30:24-42:9). Megace ES® has generated more than $600 million in net sales since its launch in 2005. *See* A3244-45 (52:17-55:17).

The asserted claims are tailored to this reduction in food effect. Claim 1 recites:

> A method of increasing the body mass in a human patient suffering from anorexia, cachexia, or loss of body mass, comprising administering to the human patient a megestrol formulation, wherein:
>
>> (a) the megestrol acetate formulation is a dose of about 40 mg to about 800 mg in about a 5 mL dose of an oral suspension;
>>
>> (b) the megestrol acetate formulation comprises megestrol particles having an effective average particle size of less than about 2000 nm, and at least one surface stabilizer associated with the surface of the megestrol particles; and
>>
>> (c) the administration is once daily;

wherein after a single administration in a human subject of the formulation there is *no substantial difference in the C$_{max}$ of megestrol when the formulation is administered to the subject in a fed versus a fasted state*,

wherein fasted state is defined as the subject having no food within at least the previous 10 hours, and wherein fed state is defined as the subject having a high-calorie meal within approximately 30 minutes of dosing.

A91-92 (41:64-43:8) (emphasis added).

Other asserted claims have limitations requiring different, specific pharmacokinetic parameters. The other asserted independent claim—claim 4—has largely the same limitations as claim 1, except that the fed-fasted difference in C$_{max}$ is selected from a defined list of percentages starting at 100%. A92 (43:15-41). The asserted dependent claims add several specific limitations, including claim 5 (difference in C$_{max}$ is less than about 60%); claims 12, 13, 26, and 27 (maximum blood plasma concentration of at least about 700 ng/ml in the fasted state); claims 14 and 28 (maximum blood plasma concentration of at least about 400 ng/ml in the fasted state); and claims 15 and 29 (a mean C$_{max}$ of about 300 to about 2000 ng/ml is obtained after single fasted-state administration). A92-93 (43:42-46:45). All these limitations relate to specific reductions in food effect, which provides actual clinical benefits. A3169-70 (28:7-29:4).

The inventors filed for patent protection on their new nanoparticulate-based method in 2002. A8196-231. The examiner granted the '576 patent in 2006, after

requesting that the inventors add the food effect limitations to the claims. *See* A14785-98, 14725-34, 14711-22, 14802-07. Specifically, the patentee added the food-effect "wherein clauses" to the claims—*e.g.*, "wherein after a single administration . . . there is no substantial difference in the $C_{max}$ of megestrol" between the fed and fasted states (claim 1); and "the difference in the $C_{max}$ of megestrol" between the fed and fasted states is less than 100% (claim 4); "difference in $C_{max}$ is less than about 60%" (claim 5). A14726-27.

## II.    PROCEDURAL HISTORY

In 2011, TWi submitted an Abbreviated New Drug Application for a generic version of Megace ES®, containing a "Paragraph IV certification," pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), that the '576 patent "is invalid" or "will not be infringed" by TWi's generic drug. A20003 ¶ 15. In response, Par filed this infringement action against TWi. A20001-08.

### A.    Bench Trial

The district court held a five-day bench trial. A20. At that trial, TWI argued that, at the time of the invention, the prior art disclosed "a need for improved bioavailability." A3008 (30:19-24). TWi also put on limited testimony concerning enablement. A27820-22. But TWi did not advance an inherency theory during trial. TWi's witnesses never testified that the claimed bioavailability and food-effect limitations would necessarily result from any particular prior art method or

11

combination of references. Accordingly, Par had neither an opportunity nor a motive to introduce evidence rebutting an inherency theory.

After trial, the district court concluded that asserted claims would have been obvious. A59. The court found, after discussing a large number of references, that the prior art disclosed every element of the claims except for the pharmacokinetic parameters relating to the food effect. A27-37, A41. To account for those limitations in its obviousness analysis, the court summarily concluded that the "pharmacokinetic parameters with respect to a food effect . . . are inherent properties of the obvious nanoparticulate formulation claimed by the '576 patent." A42-43.

The court then analyzed whether there was a motivation to combine the prior art references. The court rejected TWi's argument that it was known at the time of the invention that Megace OS had a bioavailability problem and related food-effect problem that would motivate a skilled artisan to develop the claimed invention. A28-37; A45. But it found that a person of skill in the art would be motivated "to create a method of treatment using nanoparticles" because Megace OS was "viscous and required more dosing," and because its "absorption levels varied greatly among patients." A46. According to the court, a reduction in particle size was a known solution for both these problems. A50.

## B.      Par's First Appeal

Par appealed to this Court, and the Court reversed and remanded the case. The Court held that the district court "applied the incorrect standard for inherency" when it concluded that the food effect limitations were "*an inherent property of the formulation* disclosed by the obvious combination of prior art elements." *Par I*, 773 F.3d at 1194, 1196 (emphasis added). This Court rejected the district court's conclusion that TWi had shown inherency through testimony by its expert, Dr. Beach, that "particle size improves bioavailability." *Id.* at 1196; *see also Par I* TWi Br. 19, ECF No. 57. The Court explained that the district court's "broad diktats regarding the effect of particle size on bioavailability and food effect are not commensurate with the actual limitations at issue." *Par I*, 773 F.3d at 1196. For instance, "[w]hile it may be true that a reduction in particle size naturally results in *some* improvement in the food effect," the Court noted that "the district court failed to conclude that the reduction in particle size naturally results in 'no substantial difference' in the food effect," as claim 1 requires. *Id.*

Applying the correct standard for inherency, this Court vacated and remanded the case. It instructed the district court on remand "to determine if TWi has presented clear and convincing evidence that demonstrates the food effect *as claimed* is *necessarily present* in the prior art combination." *Id.*

### C.    Proceedings on Remand

Following remand briefing and oral argument, the district court concluded that the asserted claims were invalid as obvious and not enabled.  A7.

With respect to obviousness, at the threshold, the district court refused to consider the fasted-state $C_{max}$ limitations of the dependent claims, finding that "the dependent claims do not even involve 'food effect' limitations" because they did not recite a difference between fed and fasted $C_{max}$.  A6.  Next, the district court revisited its motivation-to-combine analysis from its first decision, finding that the "prior art discloses that a skilled artisan, in creating a nanosized formulation of Megace OS, would have used particle sizes in the 100-400 nm range"—a nanoparticulate range that was not present in its previous analysis, unconnected to the problems of high viscosity and interpatient variability, and, indeed, not even advanced by either party on remand. A8  Finally, the district court concluded that TWi had proven that megestrol nanoparticles within a size range of 100 nm - 400 nm "would *necessarily* reduce the food effect so that the $C_{max}$ difference would be well under 'less than about 60%.'"  *Id.*

Specifically, the district court found that TWi had shown the food effect limitations were "inherent in multiple formulations of megestrol produced in the 100-400 nm range."  *Id.*  The district court pointed to Example 9 of the '576 patent, Megace ES® itself, and TWi's ANDA product as evidence that the food effect is

14

inherent.  A9.  And it again relied on Dr. Beach's testimony that "'oral NanoCrystal technology' leads to 'improved bioavailability,' and 'with improved bioavailability[,] [o]ne would get reduction in fed and fasted variability.'"  *Id.* (alterations in original) (quoting Dr. Beach's testimony).  In the district court's view, this Court's admonition that "the limitation at issue necessarily must be present," *Par I*, 773 F.3d at 1196, did not require "TWi to show that the claimed food effect limitations are inherent in *every* formulation claimed by the '576 patent," A10.  Instead, the court concluded that, "[i]n the obviousness context, examples are enough."  *Id.*

With respect to enablement, the district court reasoned that a person of skill in the art would not, with routine experimentation, be able to make and use nanoparticulate forms of megestrol acetate across the range of claimed particle size ("less than about 2000 nm") that achieved the claimed food effects.  A12.

## SUMMARY OF ARGUMENT

This Court held in the prior appeal "that the district court erred in its inherency analysis under our precedent."  *Par I*, 773 F.3d at 1194-96.  It vacated the district court's judgment that the '576 patent was invalid for obviousness and remanded the matter to the district court for further proceedings "to determine if TWi has presented clear and convincing evidence that demonstrates the food effect *as claimed* is *necessarily present* in the prior art combination."  *Id.* at 1196.

In spite of this Court's guidance, the district court erred again in its application of the law of inherency. The district court concluded the food effect limitations were inherent because they were found "in multiple formulations of megestrol produced in the 100-400 nm range." A8. But a limitation is not "inherent" in the prior art if only "certain . . . formulations [of the claimed combination] produce [the claimed] result," as the district court held. *Allergan, Inc. v. Sandoz, Inc.*, 726 F.3d 1286, 1294 n.1 (Fed. Cir. 2013), *cert. denied*, 134 S. Ct. 1764 (2014). Rather, the food effect limitations had to be "inherently (*always*) present in the" prior art. *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981) (emphasis added).

The district court relied on evidence that reflects its failure to apply the legal standard that this Court mandated. Rather than rely on anything in the prior art, the district court purported to rely upon three examples of nanoparticulate megestrol formulations *derived from the '576 patent* to establish the inherency of the food effect limitations. The three examples are the formulation described in Example 9 of the '576 patent, Par's commercial Megace ES® product that is based on Example 9, and TWi's copy of Par's product.

These specific examples cannot show that all formulations of megestrol with particles sizes ranging from 100 nm - 400 nm meet the claimed food effect limitations, much less show that *all* nanoparticulate formulations of megestrol do

so.  And by employing an example from the patent and related commercial embodiments instead of examples from the prior art, TWi impermissibly "[used] that which the inventor taught against its teacher."  *In re Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002) (quoting *W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983)).

The district court also relied upon Dr. Beach's testimony about "the causal relationship between nanosizing and food-effect reductions."  A9.  But the district court acknowledged that Dr. Beach "spoke in generalities" and his testimony "might not independently satisfy TWi's inherency burden." A9 n.8.  These concerns should have been decisive.  "[G]eneral and conclusory testimony" by experts "is not enough to be even substantial evidence in support of a verdict." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 23 (Fed. Cir. 2012). Perhaps recognizing these shortcomings, the district court faulted Par for not putting forward any evidence *disproving* inherency.  But this charge ignored the counter-examples in the record and improperly shifted TWi's burden to prove inherency onto Par.  *See Eurand, Inc. v. Mylan Pharm., Inc. (In re Cyclobenzaprine Hydrochloride Extended Release Capsule Patent Litig.)*, 676 F.3d 1063, 1069 (Fed. Cir. 2012).

The district court also misinterpreted this Court's mandate from the prior appeal.  In the initial appeal, this Court agreed with the district court's finding "that

the known high viscosity and high interpatient variability of Megace OS would have motivated a person skilled in the art to create a method of treatment using nanoparticles." *Par I*, 773 F.3d at 1192 (quotation omitted).  But on remand, the district court found a more specific motivation to "creat[e] a nanosized formulation of Megace OS" with "particle sizes in the 100-400 nm range."  A8.  Neither party advocated for the range the district court chose, and the court made no effort to link its choice to the prior art motivations of interpatient variability and viscosity. By improperly revisiting and narrowing the motivation to combine, the district court effectively narrowed the class of drug formulations in which the claimed "food effects" had to be present, bolstering its obviousness holding.  The district court also failed to give proper consideration to Par's dependent claims, which incorporate the food effect limitations and are separately patentable.  Both violations of this Court's mandate compel reversal.

With respect to enablement, the district court erred by concluding TWi had met its burden of proof.  The court relied on a small amount of conclusory testimony from TWi's assertions about "optimal" bioavailability at certain particle sizes—without any testimony explaining why or how such considerations would make it "practically impossible" to practice the full scope of the claims.

Par's experts, however, explained that, in light of the specification, a skilled artisan would *not* find it practically impossible to practice the full scope of the

asserted claims using moderate amounts of routine experimentation based on the disclosure of working examples and common techniques in formulation science and pharmacokinetics.    But the district court dismissed that testimony as insufficient, applying an incorrect legal standard that placed the burden on Par to show that the full scope of the claims would be operative.    That flips the enablement requirement on its head—it was TWi's burden to set forth substantial evidence showing why it would be "practically impossible" to practice the full scope of the asserted claims.    Moreover, the district court's legal test fundamentally misunderstood what the full scope of these asserted claims is.

For these reasons, the Court should hold that TWi failed to prove obviousness or lack of enablement by clear and convincing evidence and reverse the judgment of the district court.

## STANDARD OF REVIEW

The question of whether the district court applied the correct legal standard for obviousness in the context of inherency is legal in nature and reviewed de novo by this Court.    *See Par I*, 773 F.3d at 1194.    The obviousness determination is based on underlying factual determinations reviewed for clear error.    *Id.*    This Court's authority to interpret and enforce its own mandate to the district court on remand is also plenary.    *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 950-51 (Fed. Cir. 1997).    Enablement is a question of law that this Court reviews without

deference, based on underlying factual inquiries that this Court reviews for clear error. *Cephalon*, 707 F.3d at 1336.

## ARGUMENT

## I. THE DISTRICT COURT ERRED AGAIN BY FINDING THE PATENT INVALID FOR OBVIOUSNESS

The '576 patent is presumed valid. 35 U.S.C. § 282. Invalidity for obviousness, 35 U.S.C. § 103, must be established by clear and convincing evidence. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012). "That burden of proof never shifts to the patentee to prove validity. 'The presumption [of validity] remains intact and [the burden of proof remains] on the challenger throughout the litigation, and the clear and convincing standard does not change.'" *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007) (alterations in original) (quoting *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986)).

In the prior appeal, this Court held TWi failed to prove that the food-effect limitations were disclosed in the prior art. *Par I*, 773 F.3d at 1194-96. It remanded for the district court to consider whether TWi has proven by clear and convincing evidence that the food-effect limitations were necessarily present in the prior art combination. TWi has not done so, and the district court committed multiple legal errors in nonetheless finding inherency.

**A.    TWi Did Not Prove by Clear and Convincing Evidence that the Food Effect Limitations Are Inherent in the Prior Art**

In its prior opinion, this Court "recognized that inherency may supply a missing claim limitation in an obviousness analysis." *Par I*, 773 F.3d at 1194-95. At the same time, it explained that the concept of inherency, which is "rooted in anticipation," must be "carefully circumscribed in the context of obviousness." *Id.* at 1195.  "The mere fact that a certain thing may result from a given set of circumstances is not sufficient" to establish inherency in a § 103 case. *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981); *see also Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1378 (Fed. Cir.), *vacated on other grounds*, 537 U.S. 802 (2002); *In re Rijckaert*, 9 F.3d 1531, 1533-34 (Fed. Cir. 1993).

Rather, as this Court has often explained, the limitation must be "necessarily present" in the prior art.  *Par I*, 773 F.3d at 1195; *see also Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1369 (Fed. Cir. 2012); *In re Kubin*, 561 F.3d 1351, 1357 (Fed. Cir. 2009); *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999).  The prior art disclosures must be "sufficient to show that *the natural result flowing* from the operation as taught would result in the performance of the questioned function."  *Par I*, 773 F.3d at 1195 (emphasis added in original) (quoting *In re Oelrich*, 666 F.2d at 581).

*In re Oelrich*, which this Court relied upon heavily in *Par I*, illustrates the stringency of the inherency requirement in the obviousness context.  The PTO

Board of Appeals affirmed an examiner's rejection under 35 U.S.C. § 103 of claims to an apparatus for moving low-inertia steering fins on guided missiles using command signals. 666 F.2d at 579-80. The key prior art patent was directed to a similar system for high inertia steering fins, and disclosed the use of command signals at carrier frequencies that overlapped with carrier frequencies disclosed in the application. *Id.* at 580. In defending the rejection before the CCPA, the PTO argued that because "the carrier frequency which can be used in a low inertia system *may* fall within the range of carrier frequencies usable in a high inertia system . . . the apparatus of the [prior art] patent inherently performs the function of" the claimed apparatus. *Id.* The CCPA reversed, agreeing with the applicant's argument "that there is no 'inherency' because there is no 'inevitability,' that is, the previously quoted . . . limitation of [the applicant's claim] is not inherently (*always*) present in the device of the [prior art] patent." *Id.* at 581 (emphasis added).

The strict inherency concept described in *In re Oelrich* applies in pharmaceutical contexts. In *Allergan, Inc. v. Sandoz, Inc.*, this Court concluded that a claim was not obvious based on inherency because "[t]he evidence of record does not establish that the dose reduction 'from 3 to 2 times a day without loss of efficacy' limitation is an inherent property or a necessary result of the administration of 0.2% brimonidine and 0.5% timolol in a single composition."

22

726 F.3d at 1286, 1294 n.1 (Fed. Cir. 2013). "Of course," this Court explained, "it *may* be true that the mere administration of 0.2% brimonidine and 0.5% timolol twice daily in any fixed combination formulation inherently produces the claimed result. Alternatively, it *may* also be true that only certain fixed-combination formulations produced this result." *Id.* (emphasis added). What "may" be true cannot be the basis for a finding of inherency under this Court's precedent.

Expansion of the scope of inherency in the obviousness context beyond limitations that are "always" present would undermine this Court's inherency jurisprudence. Inherency is usually applied in anticipation cases under § 102 because it does not matter whether the inherent property was known. This Court has long held that "[i]nherency and obviousness are distinct concepts." *Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1576 (Fed. Cir. 1986). "That which may be inherent is not necessarily known," and "[o]bviousness cannot be predicated on what is unknown." *In re Rijckaert*, 9 F.3d at 1534 (citation omitted). "[A] retrospective view of inherency is not a substitute for some teaching or suggestion supporting an obviousness rejection." *Id.*

These concerns are particularly salient in this case. No prior art reference in this case disclosed any particular nanoparticulate formulation of megestrol acetate, and no record evidence plausibly suggests that any and every formulation made

following the prior art would inherently solve the previously unknown food-effect problem.

In its analysis, the district court purported to rely on the testimony of TWi's expert, Dr. Beach, and three example nanoparticulate megestrol formulations:

- Example 9 of the '576 patent itself, which disclosed three different formulations using particle sizes in the 223-237 nm range that show fed-fasted differences of 7.3%, 9.2%, and 13.7%. A89-91 (38:53 – 41:54).

- Par's Megace ES® product, which uses particle sizes in the 270-290 nm range. Megace ES® has essentially the same formulation as Example 9.

- TWi's accused ANDA product, which has particle sizes in the 230-330 nm range. TWi's formulation is a copy of Megace ES®.

*See* A8-9.

This evidence does not even begin to carry TWi's heavy burden to show by clear-and-convincing evidence that *all* nanoparticulate formulations of megestrol that a skilled artisan might make combining the prior art references have the claimed food effect.

First, these are not truly three examples. The district court relied upon one example drawn from the '576 patent; Par's commercial implementation of that example; and TWi's generic copy of Par's product. In substance, there is only one example.

Second, even if they could be considered three different examples, there is no basis to conclude, based on three examples that were all created based on the teaching of '576 patent, that the food effect limitations are present in all nanoparticulate formulations of megestrol a skilled artisan would have created from prior art without the teachings of that patent. As the district court noted in its summary judgment order, one of TWi's principal nanoparticulate references "permit[ted] a nearly limitless array of drug formulations and delivery mechanism combinations." A25153. And the specification details how the inventors made multiple formulations of megestrol (A83 (26:25-55)), performed a dog study (A83-85 (26:57-30:19)), and undertook extensive experimentation with a number of surface stabilizers and surfactants at different concentrations (A86-89 (32:40-38:52)).

The specification then reports that the "best nanoparticulate megestrol acetate formulation for commercial development,"—which was used in Example 9 and is essentially the same as Megace® ES—was the result of all that previous work: "Based on mean particle size, physical stability, and the preclinical dog study. . . [and] based on the results of the data given in the examples." A89 (38:37-46).

Although these specific formulations developed by the inventors solved the food effect they discovered, they are not prior art and do not constitute evidence

that the "nanoparticle technology" prior art would necessarily meet the food effect claim limitations. *Par I*, 773 F.3d at 1198; *see Dey, L.P. v. Teva Parenteral Medicines, Inc.*, 6 F. Supp. 3d 651, 678 (N.D. W. Va. 2014) ("[T]he claimed formulations are too different from those in the prior art to argue effectively that the Asserted Claims possess the same 'inherent' stability as those prior art formulations."). Indeed, the prior art references the district court relied on for obviousness do not disclose any of the specific formulations that the Court relied on as "examples." *See, e.g.*, A14939 ¶ 0023; A14947-48 (cls. 1, 3). And TWi provided no evidence concerning the fed/fasted $C_{max}$ difference for any prior-art formulations.

The cited testimony of TWi's expert, Dr. Beach, adds little to the analysis. *See* A3113 (15:6-16:3); A3119 (39:1-40:14). Dr. Beach attempted to draw a generalization about the connection between nanoparticulate formulations of megestrol and the food effect. But the district court recognized that Dr. Beach's testimony had serious shortcomings that prevented it from serving as clear and convincing evidence of inherency. A9 n.8. Rightly so.

In the first cited passage, Dr. Beach testified that a slide from a presentation showed a "sweet spot" for particle size, which Dr. Beach presumed to be from 100 nm to 400 nm. A3113 (15:6-25. From that figure, Dr. Beach opined that "there is definitely a particle size range for a given formulation which will result in optimal

bioavailability." *Id.* (16:1-3). As this Court recognized in the last appeal, that testimony mentions nothing about food effect, and does not support TWi's assertion that the specific claim limitations at issue in this case are "necessarily present." *Compare Par I* TWi Br. 49 (citing the same testimony), *with Par I*, 773 F.3d at 1196 (holding that Dr. Beach's testimony was insufficient to prove inherency).

In the second cited passage, Dr. Beach, referring back to the testimony discussed above, explained—in the context of enablement—that the '576 patent specification teaches how to obtain the "improved fed/fasted property" in the particle range of 100-400 nanometers. A3119 (39:1-40:14). The specification may teach how to achieve the claimed food effect limitations, but that does not demonstrate that the limitations necessarily result from the prior art combination that would have been obvious without the patent.

None of Dr. Beach's testimony relates to the issue on remand of whether the prior art necessarily results in the specific claimed parameters (*i.e.*, "$C_{max}$ is less than 60%," "maximum blood plasma concentration of megestrol is at least about 400 ng/ml," or any of the other specific limitations in the dependent and independent claims). Dr. Beach never testified that the particular claim limitations were necessarily present in anything, much less in all of the potential combinations of megestrol and nanoparticle technology that may result from pursuing viscosity

or interpatient variability as a motivation. Indeed, his entire testimony was provided against the background of his belief "that a food effect for micronized megestrol was known in the art"—a proposition rejected by both the district court and this Court. *Par I*, 773 F.3d at 1194.

In short, TWi's evidence is, once again, "not commensurate with the actual limitations at issue," *Par I*, 773 F.3d at 1196, and TWi has simply failed to carry its burden to prove by clear and convincing evidence that the asserted claims are obvious.

## B.    The District Court Committed Multiple Legal Errors in Its Remand Opinion

In reaffirming its obviousness determination, the district court committed three reversible legal errors.

### 1.    *The district court violated this Court's mandate by revisiting the motivation to combine and refusing to consider dependent claims*

First, the district court violated this Court's mandate by revising its prior holding on motivation to combine that this Court affirmed in the first appeal, and by failing to consider dependent claims that were critical to a complete reassessment of the inherency of the food effect limitations.

"[I]ssues actually decided [on appeal]—those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court—are foreclosed from further consideration" by the district court on remand.

28

*Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999).  In *Par I*, this Court found that "[t]he district court . . . did not err in finding a motivation to combine megestrol with nanoparticle technology due to the known viscosity and interpatient variability problems with micronized megestrol." *Par I*, 773 F.3d at 1198.  This Court was careful to exclude the motivation to combine issue and focus the district court's attention on inherency when crafting its instructions to the district court on remand:

> Although *we agree with the district court's analysis and conclusions on motivation to combine*, reasonable expectation of success, and objective indicia of nonobviousness, we vacate the district court's judgment that the '576 patent is obvious, and remand for further analysis of the food effect limitation consistent with our precedent on inherency.

*Id.* at 1200-01 (emphasis added).

The district court recognized that "only the inherency analysis with respect to the food effect limitations is subject to further evaluation [on remand]; motivation to combine . . . [is] not." A5.  Nonetheless, the district court found for the first time on remand that a "skilled artisan, in creating a nanosized formulation of Megace OS, would have used particle sizes in the 100-400 nm range." A8.

This motivation to combine was more specific than the motivation to combine the district court found after trial and this Court affirmed.  Indeed, this Court's opinion in the previous appeal acknowledged that the prior art disclosed the "manufacture of drug particles less than either 1000 nm or 400 nm in size."

*Par I*, 773 F.3d at 1191. This Court's acknowledgment that a skilled artisan looking at the approximately twenty prior-art references submitted by TWi would have considered particle sizes 1000 nm precluded the district court from re-crafting the motivation to combine to exclude that range.

The district court made no findings connecting this specific range with the problems of viscosity and interpatient variability that it found a person of skill in the art would have been attempting to solve using nanoparticulate technology. Indeed, there is no connection. The 100 nm - 400 nm range in the prior art reference the district court relied upon was necessary to allow suspended particles to be injected. A3128 (76:18-21). That says nothing about the particle size range a skilled artisan would choose to lower viscosity or interpatient variability in an oral suspension. Preferred formulations for one purpose are not necessarily preferred for another.

In response to Par's opposition to this shifting of the motivation to combine, the district court asserted that Par had "conflate[d] the inherency analysis with the motivation-to-combine analysis." A5. But it was the district court and TWi, not Par, that conflated the inquiries. In the obviousness context, inherency may establish the existence of a claim limitation that is "*necessarily present* in the prior art combination." *Par I*, 773 F.3d at 1196.

30

How a skilled artisan would have combined prior art references is a distinct inquiry from the properties "necessarily present" in the combinations that would result. The latter inquiry was remanded; the former was not. By narrowing the motivation to combine, the district court also narrowed the set of megestrol formulations that necessarily incorporated the food effect limitations and lowered TWi's burden of proof on remand. Had the district court applied the proper legal standard for inherency to the motivation to combine that this Court already affirmed, it would not have invalidated the asserted claims. On its own, the district court's violation of this Court's remand order constitutes reversible error.

The district court also violated the mandate by failing to address dependent claims 7, 12-15, 19, and 26-29 of the '576 patent. This Court held that the district court's statements about "the effect of particle size on bioavailability and food effect [were] not commensurate with the actual limitations at issue." *See Par*, 773 F.3d at 1196. The dependent claims are affected by these issues just as the independent claims are. Nonetheless, the district court found that the dependent claims "do not even involve 'food effect' limitations" because they did not recite a "difference in $C_{max}$" and therefore could not be considered on remand. A6.

That is incorrect. All of the dependent claims, of course, "involve food effect limitations"; they incorporate all the limitations of the independent claims. *See* 35 U.S.C. § 112, fourth paragraph (2006). More importantly, the fasted-state

bioavailability limitations of the dependent claims—particularly the fasted-state $C_{max}$ of greater than 700 ng/ml, 400 ng/ml, or 300 ng/ml described in claims 12-15—are themselves food effect limitations, even when they do not recite an explicit "difference" between the fed and fasted $C_{max}$ values. Par independently asserted the validity of these claim to this Court in the previous appeal as limitations "associated with eliminating the food effect." *Par I* Par Opening Br. 31, 39-41, ECF No. 46, *Par I* Par Reply Br. 7-11, ECF No. 64.

This Court's decision contains no indication that these claims fell outside the Court's holding. The specific, claimed fasted-state $C_{max}$ reflects the reduced or eliminated difference between the fed $C_{max}$ and fasted $C_{max}$ for the claimed megestrol formulation. The district court has never found that these specific claims were disclosed by the prior art. *See* A42. Thus, unless those claims are inherent in the prior art, the dependent claims are not obvious independent of the validity of the independent claims. The district court should have considered whether these specific pharmacokinetic parameters were inherent in the prior art, but it failed to do so.

> 2.    *The district court again applied the wrong legal standard for inherency in the context of obviousness*

Even within its narrow interpretation of this Court's mandate, the district court failed to apply the proper legal standard for inherency. It paid lip service to the governing standard by asserting that "TWi has proven that megestrol

32

nanoparticles within [the 100 nm - 400 nm range]" would *necessarily* reduce the food effect so that the $C_{max}$ difference would be well under 'less than 60%.'" A8. But in the very next sentence, the district court confirmed what it actually meant: TWi had proven that "the claimed food effect reductions are inherent in *multiple formulations* of megestrol produced in the 100-400 nm range." *Id.* (emphasis added). And it explicitly rejected the proposition that TWi had to prove anything more: "Par has not pointed to any authority requiring TWi to show that the claimed food effect limitations are inherent in *every* formulation claimed by the '576 patent. In the obviousness context examples are enough." A10.

That statement cannot be reconciled with this Court's instructions. To show inherency in the context of obviousness, this Court requires "clear and convincing evidence that demonstrates the food effect *as claimed* is *necessarily present* in the prior art combination." *Par I*, 773 F.3d at 1196. If the limitation is not "*always*[] present" in the prior art, it is not inherent. *In re Oelrich*, 666 F.2d at 581 (emphasis added). Thus, unless *every* nanoparticulate formulation of megestrol that a skilled artisan might make by combining the prior art references the district court relied upon for obviousness would inevitably meet the food effect limitations—including, but not limited, to those with particle sizes between 100 nm and 400 nm—TWi's invalidity defense fails.

Examples are not enough. There was a significant degree of overlap between the carrier frequencies of the input signals in the prior art reference and the applicants' claims in *In re Oelrich*, but that was insufficient as a matter of law to show that a carrier frequency at a particular frequency range was inherent in the prior art. Likewise, in *Allergan*, the possibility that formulations of a drug "may" produce the claimed result did not support a finding of inherency.

The district court appears to have conflated inherency with a different legal principle—the relationship between genus and species in an obviousness analysis. *In re Cuozzo Speed Technologies, LLC*, the principal case the district court relied upon, does not address inherency, but instead stands only for the proposition that if the prior art suggests a specific combination, a broader claim that encompasses that specific combination will be obvious. 778 F.3d 1271, 1284 (Fed. Cir. 2015). But the converse is not true: where the prior art provides only a general motivation to combine prior art, the standard for inherency is not met if some of those combinations do not have the claimed features.

Conflating genus-species law with inherency, as the district court did here, would create a dangerous precedent if affirmed. The district court's holding that "[i]n the obviousness context examples are enough," A10, is no different than saying that a claim is obvious under the inherency doctrine if the feature missing from the prior art is "possible." But "[i]nherency . . . may not be established by

34

probabilities or possibilities," and must be "carefully circumscribed" in the context of obviousness. *Par I*, 773 F.3d at 1195 (quoting *In re Oelrich*, 666 F.2d at 581). The district court's statement of the law cannot be squared with this Court's exposition of the law of inherency and should be reversed.

> 3.    *The district court improperly tasked Par with disproving inherency and disregarded its counter-examples*

Finally, the district court erred by effectively placing the burden on Par to disprove inherency of the food effect limitations, and disregarding Par's evidence doing precisely that.  It was *TWi*'s burden to prove inherency.  TWi introduced no expert testimony at trial that would tend to prove inherency, and that failure dispositively established that TWi cannot meet its clear-and-convincing burden. *See Aspex Eyewear, Inc. v. Concepts in Optics*, 111 F. App'x 582, 588 n.8 (Fed. Cir. 2004) ("This lawyer-prepared chart cannot, of course, substitute for testimony of one of skill in the art"); *see also Allergan, Inc. v. Barr Labs., Inc.*, 501 F. App'x 965, 971-72 (Fed. Cir. 2013).  Attorney argument alone cannot substantiate TWi's purported answer to this complex scientific question when TWi did not submit any expert testimony on this point at trial.

To cover up the lack of expert testimony on inherency at trials, TWi relied upon a variety of general statements Dr. Beach made at trial regarding bioavailability and particle size.  But "general and conclusory [expert] testimony is not enough to be even substantial evidence in support of a verdict," and this Court

should not permit TWi to rely on such testimony to support its verdict. *Whitserve*, 694 F.3d at 24; *see also Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002); *Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1267 (Fed. Cir. 2008); *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004).

The district court then improperly shifted the burden for proving inherency to Par, faulting it for not "com[ing] forward" with counter-example formulations that demonstrated the limitation are *not* inherent in the prior art. A10. But this purported lack of proof was brought about by TWi's failure to put on an inherency case. Par had no reason to produce counter-examples at trial and no opportunity to rebut them later. Nor did it have an opportunity to rebut the revised motivation to combine the district court discovered after remand. By overlooking TWi's failure of proof and faulting Par for not disproving what TWi had failed to prove in the first place, the district court "disregard[ed] where the burdens of proof and persuasion are properly placed in district court litigation" in a manner "inconsistent with Supreme Court case law." *Eurand, Inc. v. Mylan Pharm., Inc. (In re Cyclobenzaprine)*, 676 F.3d 1063, 1079-81 (Fed. Cir. 2012).

Moreover, the district court's conclusion that Par produced *no* evidence disproving inherency, including counter-examples, is belied by the record and highlights the need for expert testimony to support an inherency finding under the

facts of this case. The '576 patent discloses results from a dog study using nanoparticulate megestrol that calculates a fed/fasted variability of 71% to 84%. A9-10; A84 (Tables 2 & 3) (*see* note 1, *supra*, for calculation formula). That shows a food effect outside the 60% food effect limitation of claim 5. Since Dr. Beach did not present an inherency case, he did not address the example, and since Par's experts were not responding to an inherency case, they did not address it either.

But the district court—based on a single internal email—rejected Par's argument that this study defeated TWi's inherency case for claim 5. Remarkably, with no expert or other testimony, the court concluded that Par had not rebutted TWi's inherency theory because the example used dogs rather than humans. A10. That was a clear and improper burden-shift.

In addition, for the fed/fasted variability limitations (less than 100%, less than 60%, no substantial difference), the most preferred formulations span the range of 8-55%, but the specification envisions formulations with up to 100% variability still falling within the broadest claims. If 100% variability is possible, then the narrower claims, *e.g.*, 60% in claim 5, cannot be inherent. The district court did not give fair consideration to these counter-examples, any one of which would have defeated its conclusion.

## II.    THE DISTRICT COURT ERRED BY FINDING THE ASSERTED CLAIMS NOT ENABLED

To prove that a claim is invalid for lack of enablement, "a challenger must show by clear and convincing evidence that a [skilled artisan] would not be able to practice the claimed invention without 'undue experimentation.'" *Allergan, Inc. v. Sandoz Inc.*, No. 2014-1275, 2015 WL 4639308, at *13 (Fed. Cir. Aug. 4, 2015) (citation omitted).    That burden never shifts—it is the challenger's alone. *Cephalon,* 707 F.3d at 1337.    "Enablement is not precluded by the necessity for some experimentation" so long as it is not "undue." *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988); *see also United States v. Telectronics, Inc.*, 857 F.2d 778, 785 (Fed. Cir. 1988).    Thus, "[o]nly a sufficient description enabling a [skilled artisan] to carry out an invention is needed." *Allergan*, 2015 WL 4639308, at *13.

### A.    The District Court Relied on Conclusory Expert Testimony Lacking Any Indication About Quantity of Experimentation

An expert's "*ipse dixit* statements"—for example, that achieving aspects of a claimed invention would be "very difficult" or "complicated,"—"*cannot be enough* to constitute clear and convincing evidence" of non-enablement. *Cephalon*, 707 F.3d at 1338 (emphasis added).    Expert testimony that is "largely unsupported," "carries little weight" in the enablement analysis, even "[d]espite the district court's finding according credibility" to the expert. *Id.*    "The district court's reliance" on conclusory expert testimony "does not rescue" the expert's

"unsubstantiated statements." *Id.*

Thus, a challenger bears the burden of "recounting *the amount of experimentation* one of skill in the art would require to [practice the claimed invention] in view of the [patent's] disclosure." *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1321 (Fed. Cir. 2003) (emphasis added). Absent such evidence, the challenger merely "asks this court to draw the inference of undue experimentation based on limited general testimony." *Id.*

TWi failed to introduce any substantiated expert testimony about enablement, let alone any testimony regarding the amount of experimentation necessary to practice the claimed invention in view of the specification's undisputedly working examples and the background knowledge of a skilled artisan. That alone is dispositive.

The district court stated that "TWi provided expert testimony at trial explaining why formulations of the claimed invention that use particle sizes below 100 nm and above 750 nm cannot achieve the claimed food effect limitations." A12. The court relied on testimony by Dr. Beach that is demonstrably conclusory.

First, the court relied on testimony from Dr. Beach that was not even about enablement. In connection with TWi's obviousness theory, Dr. Beach was testifying regarding "optimal bioavailability" for oral delivery of poorly water-soluble drugs. A3113 (13:21-15:5); A16490-580. In particular, he referred to a

"sweet spot, if you will, for bioavailability," around 100 nm to 400 nm particle size. A3113 (15:12-16). Dr. Beach, himself, explained the implications of his testimony: "So there is definitely a particle size range for a given formulation which will result in *optimal* bioavailability." *Id.* (16:1-3) (emphasis added).

Dr. Beach's testimony was thus directed to *an optimum* for bioavailability for a particular formulation—not the *absence* or *impossibility* of bioavailability. But "optimality" is not required for enablement. *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1577 (Fed. Cir. 1984). Dr. Beach did not testify that a supposed lack of "optimum bioavailability" would make it "practically impossible" to achieve the claimed food effect, as the district court stated. A12-13. Indeed, as set forth in Section II.B below, Par's experts affirmatively explained that the opposite is true.

<u>Second</u>, when he vaguely addressed enablement, the content of Dr. Beach's testimony was conclusory and did not even address the quantity of experimentation involved in practicing the scope of the asserted claims in light of the specification. Nor did Dr. Beach address whether such experimentation would involve anything other than routine techniques.

With respect to "particle size[s] below" 100 nm, the district court relied on Dr. Beach's testimony about the "sweet spot":

> As we go down in particle size, below a certain cutoff – *let's call it for [the] sake of this a hundred microns* – the particles tend to

40

reaggregate and begin to act as large particles.

. . .

So as I indicated, less than that [*i.e.*, 100 nm], meaning, you know, the left-hand part of this shows a decrease in bioavailability.

A3113 (15:22-25); A3119 (40:7-9) (emphasis added).

Similarly, with respect to "particle sizes about 750 nm," the court relied on related testimony about the "sweet spot":

As we go up in particle size from that [*i.e.*, 400 nm] to micron particle size [*i.e.*, 1000 nm] and larger, we get very large particles and decreased bioavailability.

. . .

To the right of it [*i.e.*, 400 nm], outside the sweet spot, larger particle sizes show a decrease in bioavailability.

A3113 (15:19-21); A3119 (40:9-11).

Moreover, Dr. Beach's selection—and the district court's reliance—on thresholds of 100 nm and 400 nm was arbitrary. The slide about which Dr. Beach was testifying did not indicate whether the particle sizes at issue were effective average size and did not list any specific sizes:



A16532.

This testimony was insufficient for enablement in several respects.

Initially, Dr. Beach made mere assertions about "reaggregat[ion]" and "decreased bioavailability," without any of the necessary follow-up testimony that these factors would foreclose the possibility of making *formulations* that achieve the claimed food effect. The district court appeared to reach that conclusion based on its own inferences about this testimony. A12-13. But mere assertion by an expert that achieving a claimed limitation may be "very difficult" or "complicated," "cannot be enough to constitute clear and convincing evidence" of

non-enablement. *Cephalon*, 707 F.3d at 1338.

The district court believed that "the trial record clearly shows Dr. Beach addressed the *Wands* factors," even if not explicitly. A13. That is incorrect. The court relied on Dr. Beach's testimony that, "I was educated as to what enablement consists of by counsel." A3119 (38:12-16). Though the specific *Wands* factors may be "illustrative," "[w]hat is relevant depends on the facts," and TWi bore the burden to introduce substantiated expert testimony on the "relevant" "facts." *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991). It did not meet that burden. A district court's "cursory consideration" of the *Wands* factors, even "assuming . . . [their consideration] w[as] accurate," is "not dispositive" where "the record still lacks evidence of undue experimentation." *Cephalon*, 707 F.3d at 1340 n.11. That principle controls.

When explaining his "reasoning" regarding enablement, Dr. Beach returned to his "sweet spot" testimony: "If it's less than 100 nanomaters or greater than 750 nanometers, then it's really not enabled *because there is nothing in the patent that shows me the particle sizes of the product in that range that meet the claims of the patent.*" A3119 (39:16-20) (emphasis added). That opinion is insufficient as a matter of law. Enablement is met "if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed." *Elan Pharm., Inc. v. Mayo Found. for Med.*

*Educ. & Research*, 346 F.3d 1051, 1055 (Fed. Cir. 2003) (citation omitted).  And as Par's experts explained—without refutation by TWi—the '576 patent specification provides not only this requisite guidance, but also numerous working examples of the claimed inventions.  *See* Section II.B, below.

Additionally, Dr. Beach's testimony (like the district court's opinion) appeared related to the supposed properties of *individual* particles of specific sizes.  There is no dispute, however, that the asserted claims recite "megestrol particles having an *effective average particle size* of less than 2000 nm."  A91 (42:59-61) (emphasis added).  And the specification defines that limitation as "*at least 50%* of the nanoparticulate megestrol . . . have a particle size of less than 2000 nm, *by weight*, when measured by the above-noted techniques."  A80 (20:49-53) (emphasis added).

The disconnect between the cited testimony and the claim limitation is significant.  As explained in Section II.B below, the specification discloses bimodal and multimodal particle size distributions in order to achieve effective average particle sizes.  As Par's experts testified, a skilled artisan would understand this disclosure to be a potential solution, to the extent there are supposed bioavailability challenges associated with *individual* particles of a particular size.  For example, one could achieve an *average* effective size of 1500 nm using a relatively small number of heavy particles with a large diameter along

with a correspondingly large number of lighter particles with a smaller diameter. And as noted in Dr. Berkland's testimony, solutions beyond particle size distribution optimization, including the use of surface stabilizers, can be employed by a skilled artisan to overcome said bioavailability challenges. Dr. Beach—and the district court—did not consider those possibilities.

### B.    The Court Erred By Discounting Par's Expert Testimony Regarding the Specification's Working Examples and Routine Experimentation

In addition to TWi's failure of proof, Par introduced affirmative evidence that, in light of the '576 patent's teachings, a skilled artisan could practice the full scope of the asserted claims with, at most, routine experimentation. A3236 (17:17-19:2). Where "an embodiment is admittedly disclosed in the specification, along with the general manner" of ascertaining a claimed feature, then "other permutations of the invention could be practiced by those skilled in the art without undue experimentation." *Telectronics, Inc.*, 857 F.2d at 786.

For example, Dr. Berkland testified that the specification teaches a skilled artisan various techniques to make the full effective average particle size range of the asserted claims. A3236 (18:12-22). Dr. Berkland further testified that the specification teaches how to adjust the dose concentration or the identity or amounts of other ingredients, including surface stabilizers and surfactants, to

achieve a formulation meeting all of the elements of the claims. A3237-38 (23:11-25:15).

Dr. Berkland further explained how the claimed particle sizes can be intentionally manipulated by creating multimodal particle size distributions. The claimed range is specified as a "D50," meaning that 50 percent of the particles are smaller than that number and 50 percent are larger, *by weight*. A3236 (19:3-11); A80 (20:49-53). Due to their weight, the presence of a just few large particles could raise the effective average particle size to about 2000 nm, even though the formulation is primarily composed of much smaller particles. A3236 (20:15-21:6). The '576 patent expressly discloses such "multimodal" distributions. *Id.* (20:1-24, 22:23-23:3). Therefore, "a person of ordinary skill would understand that you have a significant amount, a large number of nanoparticulates, and just a few microparticulates." A3237 (21:3-23:10).

Moreover, Dr. Fleckenstein further testified that formulations prepared according to the specification resulted in food effects ranging from 8-55%, showing that the patent enables a person of ordinary skill to make nanoparticulate formulations and carry out the claimed method to achieve the food effect limitations. A3169 (25:12-26:10). Indeed, the '576 patent discloses multiple examples describing the preparation and characteristics of nanoparticulate dispersions of megestrol acetate having various particle sizes, A83 (Ex. 1 (26:23-

55)); A85-89 (Exs. 3-8 (30:22-38:52)), as well as pharmacokinetic parameters of nanoparticulate megestrol acetate formulations   (A83-85 (Ex. 2 (26:57-30:19)); A89-91 (Ex. 9 (38:54-41:61)).

Dr. Fleckenstein testified that the '576 patent provides a "standard pharmacokinetic protocol to determine the blood plasma concentration in humans following administration of a nanoparticulate megestrol composition," such that a person of ordinary skill "could vary the nanoparticulate size and achieve the kind of profile that you wanted to achieve."  A3188-89 (103:8-105:15); A76 (12:16-51).

Simply put, to the extent there were some challenge associated with "reaggregat[ion]" at an effective average particle size range of less than 100 nm, or some challenge associated with bioavailability at an effective average particle size range of more than 750 nm, as Dr. Beach posited, Par introduced unrebutted expert testimony that a skilled artisan could draw on ordinary techniques presented in the specification to overcome such challenges.  TWi failed to introduce any evidence that such techniques would be extensive or beyond routine.  In any event, even "extensive experimentation does not necessarily render the experiments unduly extensive" where—as here—they "involve repetition of known or commonly used techniques."  *Cephalon*, 707 F.3d at 1338.

### C.   The District Court's Analysis Was Premised on an Incorrect Legal Test

The district court discounted Par's experts' testimony on the basis that

"neither expert answered" the question of "whether the specification enables a *union* of the" average effective particle size and food effect limitations—that is, "does the '576 patent teach how to make formulations across the claimed particle range that *simultaneously* have the claimed food effects?" A16. That test of enablement, which impose a "union" rather than "intersection" requirement, was legal error.

"The specification shall contain a written description of the invention , and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . ." 35 U.S.C. § 112, first paragraph. The enablement requirement considers the relationship between the specification (in light of a skilled artisan's background knowledge) and the scope of the asserted claims, taking into account each and every limitation.

The district court erroneously extended the requirement by requiring that the full scope of one claim element (effective average particle size) enable the simultaneous achievement of a different claim element (food effect). The court framed the "ultimate legal question," not as whether the full scope of the claim was enabled, but rather as whether the '576 patent teaches how to make formulations across the claimed effective average particle size range that simultaneously have the claimed food effects.

But the claimed effective average particle size range is a different limitation than the food effect limitation.  The asserted claims encompass only embodiments that meet both limitations.  If a particular formulation product meets the effective average particle size limitation, but not the food effect limitation, it falls outside the claim scope.  By including the food effect limitation, the asserted claims necessarily exclude all products that do not achieve food effect.

Neither TWi nor the district court has cited any authority from this Court holding a claim invalid for lack of enablement because the full scope of one element did not "enable" a different element.  The statute, and this Court's precedent, require that the specification enable a person of ordinary skill to make and use the claimed invention.

There was no real dispute at trial that the '576 patent specification enables formulations that fall within the claimed effective average particle size range and meet the food effect limitations.  Par presented evidence that a skilled artisan could make stable oral suspension products with particle sizes throughout the claimed range (A3236 (17:17-19:2)), and that particular embodiments within that range showed food effects ranging from 8% to 55% (A3169 (25:12-26:10)).  That evidence should have compelled a finding in Par's favor.

The district court's erroneous "union" requirement would lead to incongruous results.  A hypothetical example is instructive: If an independent

claim similar to claim 1 of the '576 patent included an effective average particle size range from 100-2000 nm, along with all remaining elements other than the food effect limitation, there would be no dispute that the full scope of that claim was enabled. That is because there is no real dispute that formulations throughout that effective average particle size range can be made and used according to the claimed method.

But, if a narrower dependent claim added an element specifying the most preferred food effect (e.g., less than 10%), and if that most-preferred food effect could be obtained only within a subset of the 100-2000 nm effective average particle size range, the district court's legal standard would require that the narrower dependent claim be held invalid because its full scope was not enabled. Paradoxically, the broader independent claim would remain valid.

The authority on which the district court relied is not contrary. A14-16. First, *Alcon Research, Ltd. v. Apotex Inc.* was not even about the legal standard for enablement. 687 F.3d 1362 (Fed. Cir. 2012). There, the independent claim at issue specified a "therapeutically effective amount" of the compound olopatadine. *Id.* at 1364. A dependent claim specified that "the amount of [olopatadine] is between about 0.0001 w/v. % to about 5% (w/v). *Id.* at 1367. The accused infringer relied on an invalidating prior art reference that disclosed administration of olopatadine within the claimed range up to 0.01 w/v %. *Id.* at 1367-68. The

patentee attempted to argue that the prior art reference did not invalidate the claims because 0.01% w/v was not a "therapeutically effective amount." *Id.* at 1367-68.

This Court explained that the patentee could not merely disavow the portion of the dependent claim (which by law is a subset of the broader independent claim). *Id.* at 1368. Thus, this Court reversed the district court's holding that the claims would not have been obvious. *Id.* at 1368-69. Notably, the basis for the Court's holding was that a dependent claim cannot by law be broader than the independent claim from which it depends. *Id.* at 1367 ("Therefore if claim 2 covers the range from 0.0001% w/v–5% w/v, claim 1 must cover at least that range."). "As a result," 0.01% w/v must be a "therapeutically effective amount." *Id.*

*Alcon* does not apply here. At the outset, here, Par is not attempting to disavow any claim scope from the asserted claim. To the contrary, it is precisely the narrowed scope of the asserted claims that prevents the non-enablement conclusion. Indeed, the Patentees introduced the fed/fasted state limitation during prosecution of the '576 patent to further narrow the pending claims. A14785, A14726-34, A14711-22, 14797, 14802-07.

Moreover, *Alcon* addressed two variations of the *same* "amount" claim limitation—one specifying an amount qualitatively, the other specifying a subset of the same "amount" numerically in a dependent claim. Here, by contrast, the

effective average particle size and food effect limitations are entirely distinct.  In contrast to the dispositive legal requirement in *Alcon* that a dependent claim be narrower in scope that its independent claim, no legal principle prohibits the food effect limitation from narrowing the scope of the asserted claims.

Second, in *MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*, the claims at issue recited "a change in resistance of at least 10%," which the record indicated covered resistive changes at least as high as 1000%.  687 F.3d 1377, 1381 (Fed. Cir. 2012) (citation omitted).   By contrast, the specification disclosed only a 11.8% change, and the patentee's expert testified that experimentation could yield at most a 100-120% change.  *Id.* at 1382.  This Court observed that the limitation at issue was "open-ended" and lacked "an upper limit," *id.* at 1383, yielding a nearly infinite discrepancy between the specification and claimed range.  By contrast, here, the asserted claims clearly *do* recite a pertinent upper limit—"an effective particle size of *less than about 2000 nm*."   Furthermore, none of Par's experts disavowed the operability of any subset of the claimed particle size range, and the challenger offered no non-conclusory evidence in that vein, either.

The present case is not comparable.  It is undisputed that the '576 patent enables substantial elimination of the food effect, and achievement of the specified numerical values (*e.g.*, <100%, <60%).  It is only through the district court's novel "union" legal standard —requiring the claimed elimination of the food-effect for

any and all possible values of the distinct effective average particle size limitation—that the court reached its finding of lack of enablement.

That the district court applied a legally erroneous test of enablement is confirmed still further by this Court's precedent. For instance, "[e]ven if some of the claimed combinations were inoperative, the claims are not necessarily invalid." *Atlas Powder*, 750 F.2d at 1576. The key question is whether one of ordinary skill must "experiment unduly" in light of the scope of the claim at issue. *Id.* Thus, "a patentee is not required to provide actual working examples," let alone of every possible point within a claimed range. *Allergan*, 2015 WL 4639308, at *13 (citation omitted). Even the "[u]se of prophetic examples does not automatically make a patent non-enabling." *Atlas Powder*, 750 F.2d at 1577.

*Atlas Powder* is instructive. There, the claims were directed to "an emulsion blasting agent consisting essentially of" various components. *Id.* at 1572 (citation omitted). The specification disclosed "numerous salts, fuels, and emulsifiers that could form thousands of emulsions," and the challenger argued that "there is no commensurate teaching as to which combination would work." *Id.* at 1576. The district court held that it would have been "impossible" to "list all operable emulsions and exclude the inoperable ones," and, moreover, "found such list unnecessary, because one skilled in the art would know how to select a salt and

53

fuel and then apply [a test] to determine the proper emulsifier." *Id.* This Court affirmed.

Here, the specification undisputedly discloses actual working examples of formulations that comprise parts of the claimed effective average particle size range and achieve the claimed food effect. *See, e.g.*, A83 (Ex. 1 (26:23-55)); Exs. 3-8 (30:22-38:52)). It also discloses routine techniques to vary the effective average particle size, adjust the formulation, and ascertain that the claimed food effect is achieved.

Dr. Beach did not address the disclosure of these routine techniques, let alone refute that they could result in working formulations comprised of particles having effective average sizes within the claimed range and achieving the claimed food effect. Instead, he relied exclusively—and narrowly—on the lack of examples of formulations having certain effective average particle sizes. And in any event, as a matter of law, "[i]t is not a function of the claims to specifically exclude . . . possible inoperative substances." *Atlas Powder*, 750 F.2d at 1576 (second alteration in original) (quoting *In re Dinh-Nguyen*, 492 F.2d 856, 858-59 (C.C.P.A. 1974)).

The district court's legal standard and consequent finding of non-enablement should be reversed.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and the case remanded for further proceedings.

Dated:  August 24, 2015

Respectfully submitted,

/s/ Maryellen Noreika
Maryellen Noreika
Jack B. Blumenfeld
Jeremy A. Tigan
MORRIS, NICHOLS, ARSHT &
    TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

James Patrick Ulwick
KRAMON AND GRAHAM, P.A.
One South Street
Suite 2600
Baltimore, MD 21202
(410) 752-6030

*Counsel for Plaintiff-Appellant*
*Alkermes Pharma Ireland Limited*

/s/ Daniel G. Brown
Daniel G. Brown
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 20022-4834
(212) 906-1200

Gregory G. Garre
Jonathan Y. Ellis
Michael J. Gerardi
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Roger J. Chin
Gregory K. Sobolski
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

James Patrick Ulwick
KRAMON AND GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, MD 21202
(410) 752-6030

*Counsel for Plaintiff-Appellant Par*
*Pharmaceutical, Inc.*

## DECLARATION OF AUTHORITY PURSUANT TO
## FEDERAL CIRCUIT RULE 47.3

Pursuant to Rule 47.3(d) of the Rules of the Unites States Court of Appeals for the Federal Circuit, I, Daniel G. Brown, of Latham & Watkins LLP, hereby swear under penalty of perjury pursuant to 28 U.S.C. § 1746 that Maryellen Noreika, Counsel for Plaintiff-Appellant Alkermes Pharma Ireland Limited, has authorized me to sign the Opening Brief for Appellants on her behalf.

Executed on:  August 24, 2015

/s/ Daniel G. Brown
Daniel G. Brown

## CERTIFICATE OF SERVICE

I certify that on August 24, 2015, the foregoing OPENING BRIEF FOR APPELLANTS was filed electronically using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/ Daniel G. Brown
Daniel G. Brown

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

Counsel for Appellants, Par Pharmaceutical, Inc., and Alkermes Pharma Ireland Limited hereby certify that:

1.  This Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B): The Brief contains 12,060 words (as calculated by the word processing system used to prepare this brief), excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.  This Brief complies with the type face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).   The Brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman style font.

Dated:  August 24, 2015                    Respectfully submitted,

                                 /s/ Daniel G. Brown
                                Daniel G. Brown